IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re HEMISPHERX BIOPHARMA, :  CIVIL ACTION NO. 09-5262
INC., SEC. LITIG.     :

---

### ORDER

This is a consolidated class action brought on behalf of all persons who purchased the

common stock of Hemispherx Biopharma, Inc. between February 18, 2009 and December 1,

2009. The Consolidated Class Action Complaint, filed on March 1, 2010, included claims

against Hemispherx; Hemispherx's CEO and Board Chairman, William A. Carter; and

Hemispherx's Medical Director, David R. Strayer for making untrue statements of material facts

in violation of § 10(b) of the Exchange Act. The Complaint also included claims for joint and

several liability against Carter and Strayer for the acts of their subordinates under § 20(a) of the

Exchange Act. *(Doc. No. 28.)*

The Parties have reached a settlement.

Before me are Lead Plaintiff's Motions for Final Certification of the Settlement Class

*(Doc. No. 75)* and for Final Approval of Class Action Settlement, Plan of Allocation of

Settlement Proceeds, and Award of Attorneys' Fees and Reimbursement of Expenses *(Doc. No.*

*69.)* For the following reasons, I will grant these Motions.

### I. BACKGROUND

Hemispherx is a Philadelphia-based pharmaceutical company that developed Ampligen,

an experimental drug for the treatment of chronic fatigue syndrome. As alleged, Hemispherx

filed a New Drug Application in 2007 seeking FDA approval for Ampligen. The Agency was

expected to announce its decision in February 2009. *(Id. at ¶4.)* Because no drug therapy then

existed for the treatment of CFS, Hemispherx had high hopes that once FDA-approved, Ampligen would generate significant profits. (*Id.* at ¶44.) During this time, Hemispherx's financial condition was desperate. It was paying some of the salaries and fees due to its Board of Directors, employees, and consultants in stock, and by March 2009 it had accumulated a deficit of more than $200 million. (*Id.* at ¶¶6, 41.) According to the Complaint, by the Spring of 2009, Hemispherx was at risk of failing unless it raised money through a public stock offering fueled by the understanding that the FDA would approve the Ampligen application without difficulty or delay. (*Id.*)

The FDA delayed its action on Ampligen beyond the expected February 2009 announcement date, noting to Hemispherx deficiencies in the application and giving Defendants an opportunity to correct those deficiencies. Defendants thus knew that the FDA's delayed decision on the Ampligen application might not be favorable. (*Id.* at ¶5.) Defendants nonetheless falsely stated in February and May 2009 press releases that the FDA's delay was attributable to the Agency's heavy workload and that Hemispherx had already submitted all the requested information. (*Id.* at ¶9.) Defendant Strayer allegedly made similar misrepresentations at a medical conference in March 2009, as did Defendant Carter during a March 2009 conference call with securities analysts and investors. (*Id.* at ¶¶51-52.)

In November 2009, Hemispherx issued a press release giving the first indication that its Ampligen application might be in difficulty. The Company disclosed that as of August 2009, there were several outstanding FDA information requests, and that Hemispherx planned to submit additional data in November and December. (*Id.* at ¶11.) Within two days of this disclosure, the price of Hemispherx common stock dropped 15.04%. (*Id.* at ¶12.) On December 1, 2009, Hemispherx issued a press release stating that the FDA would not approve the

Ampligen application primarily because supporting studies "did not provide evidence of the efficacy of Ampligen." *(Id. at ¶ 13.)* The following day, the price of Hemispherx common stock plunged over 40%. *(Id. at ¶14.)*

Lead Plaintiff alleges that the Defendants intentionally defrauded investors to raise badly needed funds by artificially inflating the price of Hemispherx stock through their false and misleading statements. *(Id. at passim.)*

On March 12, 2010, Defendants filed a Motion to Dismiss the Consolidated Class Action Complaint. *(Doc. No. 29.)* I denied their Motion and issued a Case Management Order. *(Doc. Nos. 37 and 39.)* The Parties subsequently mediated the matter before retired Magistrate Judge Diane M. Welsh, and informed me on August 17, 2010 that they had reached a settlement in principle. *(Doc. No. 58.)* On September 24, 2010, the Parties submitted a Joint Motion for Preliminary Approval of Settlement, Preliminary Certification of the Class, and Approval of Notice to the Class. *(Doc. No. 62.)* I granted the Parties' Motion and held a combined Class Certification and Settlement Fairness Hearing on January 20, 2011.

## II.   CLASS CERTIFICATION

On October 20, 2010, I preliminarily certified the Class to enable Lead Plaintiff to issue Notice to the Class of the Proposed Settlement. *(Doc. No. 65.)* I will now finally certify the Class because I find that the requirements of Rule 23(a) and (b) are met.

### A.  Rule 23(a)

Rule 23(a) establishes the prerequisites to class certification: (a) numerosity, (b) commonality, (c) typicality, and (d) adequacy of representation. The "central inquiry" where a class seeks certification for settlement purposes only is the adequacy of representation, and I

have paid particular attention to that issue. In re Cmty. Bank of N. Va., 418 F.3d 277, 300 (3d Cir. 2005).

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Class here consists of all persons purchasing or acquiring Hemispherx common stock from February 18, 2009 to December 1, 2009. During this period, there were more than 7 million shares of common stock outstanding. (See Doc. No. 62 at 12.) Lead Plaintiff reasonably believes that the Class consists of hundreds, and perhaps thousands, of members. (See id.) The Class is sufficiently numerous.

There must also exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Here, the Class Members hold legally identical claims premised on the same conduct. Thus, there is a common question of law or fact. See In re Prudential Ins. Co. of Am. Sales Pracs. Litig., 148 F.3d 283, 310 (3d Cir. 1998) ("Commonality exists when proposed class members challenge the same conduct of the defendants.").

"[T]he claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). This requirement overlaps with commonality and does not require that all putative class members share identical claims. Cmty. Bank, 418 F.3d at 303. Defendants' alleged misconduct is identical with respect to all Class Members, and Defendants have not raised any defenses unique to the Lead Plaintiff. Typicality is thus met.

Finally, the class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees,' and it tests the qualifications of the counsel to represent the class." Cmty. Bank, 418 F.3d at 303 (quoting In re Gen. Motors Corp. Pick-Up

Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995)). The Third Circuit has

explained that

> concern with class counsel's representation extends to their negotiation of the settlement. "Courts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."

Cmty. Bank, 418 F.3d at 307 (quoting Gen. Motors, 55 F.3d at 801). The Parties have credibly

shown that Lead Plaintiff has no conflicts of interest with the Class. *(See Doc. No. 62 at 14.)* I

also agree that Lead Plaintiff's counsel "are highly qualified, experienced and able to conduct

this litigation." *(See id.)* Finally, the Settlement reached here was the fruit of extensive arm's-

length negotiation before a retired Magistrate Judge. *(See id. at 7.)* Accordingly, I conclude that

the requirements of Rule 23(a) are met.

### B.  Rule 23(b)(3)

Rule 23(b)(3) allows certification where "the court finds that the questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." The Rule 23(b)(3) inquiry, then, breaks down to predominance

and superiority. Predominance "tests whether the class is sufficiently cohesive to warrant

adjudication by representation." In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001).

Superiority "asks a district court 'to balance, in terms of fairness and efficiency, the merits of a

class action against those of 'alternative available methods' of adjudication." Cmty. Bank, 418

F.3d at 309 (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), *aff'd*,

521 U.S. 591 (1997).

### 1.  Predominance

Courts have often recognized that 10b-5 securities litigation is particularly suited to the class action. Common issues predominate where securities dealers purportedly defraud investors through a uniform scheme. See Hoxworth v. Blinder, Robinson, & Co., 980 F.2d 912, 924 (3d Cir. 1992). The rare exception may occur, for example, where stockholders' claims are based on unique oral misrepresentations from brokers, thus requiring particularized proof. See Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 186 (3d Cir. 2001).

Here, common issues predominate: Defendants' alleged misrepresentations in Hemispherx's press releases, in Strayer's presentation, and in Carter's conference call were the same with regard to all Class Members. See Amchem Prods., 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); see also Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is, in its broad outlines, actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.").

### 2.  Superiority

The class action is often a superior vehicle for securities litigation because potential plaintiffs are unlikely to bring individual claims to recover small damage amounts. See Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985); see also Marsden v. Select Med. Group, 246 F.R.D. 480, 489 (E.D. Pa. 2007). The interest in avoiding duplicative litigation also favors the class action in these circumstances, where the defendant's alleged fraudulent conduct was the

same with respect to all class members. See In re Sadia, S.A. Sec. Litig., 2010 WL 2884737 at *17 (S.D.N.Y. 2010). Similarly, judicial economy underscores the desirability of a class action where the only factual differences in the class members' claims is the amount and time frame of each member's securities purchase—distinctions that have no bearing on the propiety of the defendant's conduct or the class's overall potential for recovery.

All these factors weigh strongly in favor of a finding of superiority here. For these reasons, I find that the Class to be certified also satisfies Rule 23(b), and certification is warranted.

### III.  SETTLEMENT

Under the Proposed Settlement, Defendants agree to deposit $3.6 million in an escrow account in exchange for the Class's relinquishment of all claims arising from the conduct underlying this litigation. *(Doc. No. 62 at 17.)* All claimants must submit a signed Proof of Claim and Release, supported by proof of acquisition of Hemispherx stock during the Class Period. Co-Lead Counsel, as Claims Administrator, may reject Proofs of Claim that do not meet submission requirements, and Claimants may contest such a rejection by requesting the Court's review. Defendants may not recover undisbursed monies: any balance remaining in the Settlement Fund a year after the initial distribution will also be distributed to Authorized Claimants. The $3.6 million amount represents 5.2% of the maximum possible recovery of $68.6 million, and a 6.7% recovery of a more realistic damages assessment of $53.6 million. *(Doc. No. 67 at 20.)*

In finally approving a class settlement agreement, I must determine that the agreement is fair under Rule 23(e). See In re Ins. Brokerage Antitrust Lit., 579 F.3d 241, 257 (3d Cir. 2009). That Rule requires the district court to (1) "direct notice in a reasonable manner to all class

members who would be bound by the proposal," and (2) approve the proposal "only after a

hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2).

In determining the fairness of a proposed settlement agreement, the district court has

"wide discretion," providing it considers the following factors:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the
> reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the
> amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5)
> the risks of establishing damages . . . ; (6) the risks of maintaining the class action
> through the trial . . . ; (7) the ability of the defendants to withstand a greater
> judgment; (8) the range of reasonableness of the settlement fund in light of the
> best possible recovery . . . ; (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975); Shlensky v. Dorsey, 574 F.2d 131, 147 (3d

Cir. 1978).

I will approve the Proposed Settlement because I find that the notice provided to the

Class satisfied the requirements of Rule 23 and the Settlement itself is fair.

**A.  Notice**

Before certifying a class for settlement purposes only, the district court must require

notice that satisfies Rule 23(c)(2) and 23(e) requirements. See Bradburn Parent Teacher Store,

Inc. v. 3M (Minn. Mining and Mfg. Co.), 513 F.Supp.2d 322, 328 (E.D. Pa. 2007). Rule 23(b)(3)

requires "the best notice that is practicable under the circumstances, including individual notice

to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In

addition, once a settlement is proposed, "the court must direct notice in a reasonable manner to

all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

The notice given to potential Class Members satisfies Rule 23. The Lead Plaintiff mailed

a copy of the notice packet to all persons who purchased or acquired Hemispherx common stock

during the Class Period. *(Doc. No. 67 at 22.)* Additionally, a summary of the notice packet was

8

published: in the PR Newswire on November 16, 2010 and November 19, 2010; in the

BusinessWire on November 24, 2010; and in the MarketWire on November 29, 2010. *(Id.)* The

notice packet advised Class Members of the Settlement terms, the procedure for filing

objections, the place and time of the Settlement Fairness Hearing, the procedure for opting out of

the Class, the Plan of Allocation, and Lead Counsel's fee application. Accordingly, the notice

provided to Class Members was adequate. See In re Amer. Business Fin. Servs. Inc. Noteholders

Litig., 2008 WL 4974782, at *10-11 (E.D. Pa. Nov. 21, 2008) (approving identical notice

scheme in similar securities class action).

### B.  Settlement Fairness

During the January 20, 2011 hearing, Lead Counsel made a presentation on the fairness

of the Proposed Settlement. The Parties also submitted lengthy briefs in which they addressed

fairness. *(Doc. Nos. 62, 64, 70, 72.)* Upon consideration of Lead Counsel's presentation, the

Parties' filings, and my own analysis of the Girsh factors, I find that the Proposed Settlement in

this case is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

### 1.  The Complexity, Expense, and Duration of This Litigation

Courts have repeatedly held that in securities class actions, these factors weigh in favor of

settlement. See, e.g., In re Ravisent Tech. Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 6680, at *24-

25 (E.D. Pa. April 18, 2005). This is a complex matter, involving scientific and medical issues

and the FDA's review process. Absent a settlement, resolution would necessitate a lengthy jury

trial, with inevitable appeals. After years of such expensive litigation, there is no assurance that

economically distressed Hemispherx would still be in existence or sufficiently solvent to pay a

substantial sum to the Class—assuming the Class prevails.

### 2.   The Reaction of the Class to the Settlement

I have received only two, identical objection letters, apparently submitted by two members of the same family. *(Doc. Nos. 76, 77.)* This constitutes a very small percentage of the Class, given that 46,000 copies of the Notice were mailed to potential Class Members. "[O]ne indication of the fairness of a settlement is the lack of or small number of objections." Hammon v. Barry, 752 F. Supp. 1087, 1093 (D.D.C. 1990); see also Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313-14 n.15 (3d Cir. 1993) (small number of objectors demonstrates implicit consent of the class to settlement and supports approval of settlement).

Under the Private Securities Litigation Reform Act of 1995, parties to a proposed securities class action settlement must disclose the amount of the settlement on an average per share basis. 15 U.S.C. § 78u-4(a)(7)(A). The two objectors complain that this figure, $0.027 per share, is too low in light of their actual damages. The $0.027 figure does not, however, represent the actual expected recovery, because it includes non-compensable "in-and-out" transactions and undamaged shares. *(Doc. No. 73 at 2.)* The amount each Class Member will actually receive per compensable share is $0.61—5.1% of the maximum possible recovery. *(Doc. No. 73 at 9.)* Moreover, there will be a second distribution of funds remaining after the first claims period has ended. The Parties' experts estimate that with this second distribution, each claiming Class Member will receive 13.7%-16% of the maximum possible recovery. *(Id.)*

The objectors did not appear at the Fairness Hearing to discuss or explain their complaints. Having nonetheless carefully considered the objections, I find that they do not impugn the fairness of the Proposed Settlement. Cf. Amer. Bus. Fin. Servs., 2008 WL 4974782, at *6-7 (only 32 written objections and 7 verbal comments raising concern over the 2.5%

damages recovery weighed in favor of approval where notice was sent to over 29,000 class members).

### 3.   The Stage of the Proceedings and the Discovery Completed

I apply this factor to determine "whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Cendant Corp. Litig., 264 F.3d 201, 235 (3d Cir. 2001). Here, the extensive investigation conducted by Co-Lead Counsel included reviewing all the Company's public statements concerning its attempts to obtain FDA approval for Ampligen, the Company's filings with the SEC, and other relevant documents. The Parties exchanged discovery in connection with the Defendants' Motion to Dismiss, including 20,000 pages of documents constituting the Company's communications with the FDA concerning Ampligen. *(Doc. No. 37.)* In these circumstances, I am satisfied that Counsel were sufficiently apprised of this case's merits before they began their mediation before Judge Welsh.

### 4.   The Risks of Establishing Liability and Damages

Lead Plaintiff notes that a jury's finding of liability is not certain in this case: "Defendants denied and continue to deny that they issued false and misleading statements or that they acted with intent to defraud." *(Doc. No. 67 at 12.)* Indeed, "[e]stablishing materiality in any securities claim involves a complex undertaking of fact and law." In re PNC Fin. Servs. Grp., Inc., Sec. Litig., 440 F. Supp. 2d 421, 434-35 (W.D. Pa. 2006). Defendants have most vigorously argued that Lead Plaintiff will be unable to establish the requisite scienter to establish securities fraud. *(Doc. No. 67 at 13.)* Indeed, Lead Plaintiff apparently has only circumstantial evidence of scienter. *(Id.)*

Lead Plaintiff would also have difficulty proving damages and loss causation. Damages in a § 10(b) action are measured by "the difference between the purchase price and the 'true

value' of the security [i.e., its value absent fraud] at the time of purchase." Semerenko v. Cendant Corp., 223 F.3d 165, 184 (3d Cir. 2000). This is often a difficult analysis to make or understand—requiring expert assistance—involving highly complex valuation models.

### 5. The Risks of Maintaining the Class Action Through Trial

"What the district court giveth, the district court may taketh away: the court may decertify or modify a class at any time during the litigation should the class prove to be unmanageable." Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 116 (E.D. Pa. 2005). That risk is certainly present here.

### 6. Whether the Settlement Is Reasonable in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The settlement amount will afford the Class a significant recovery. It represents 5.2% of the maximum possible verdict—a percentage recovery that falls squarely within the range of reasonableness approved in other securities class action settlements. See, e.g., Amer. Bus. Fin. Servs., 2008 WL 4974782, at *7 (approving settlement that provided 2.5% recovery of damages); In re Ikon Office Solutions, Inc., Sec. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000) (approving settlement that provided 5.2% recovery of best possible amount for common stockholders and 8.7% recovery for convertible preferred stockholders); In re Gulf Oil/Citis Servs. Tender Offer Litig., 142 F.R.D. 588, 596 (S.D.N.Y. 1992) (approving settlement that provided $0.48 per share out of potential recovery of $30 per share); see also Detroit v. Grinnell, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."). As I have discussed, the settlement amount represents a 6.7% recovery of a more realistic $53.6 million verdict. *(See Doc. No. 67 at 20.)*

There are risks to the Class in proceeding to trial. The jury could return a defense verdict. Even if the Class is successful at trial, it could lose on appeal. See, e.g., Robbins v. Koger Props., 129 F.3d 617 (11th Cir. 1997) (Court overturned $81 million jury verdict on loss causation grounds and ordered entire case dismissed); Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990) (Court reversed $38 million jury verdict after ten years of litigation). Finally, as I stated earlier, there is no assurance that Hemispherx will able to withstand a multimillion judgment or will even be in existence at the conclusion of litigation.

### 7. Arm's Length Negotiations and Experienced Counsel

Although not a Girsh factor, this weighs strongly in favor of approving the Proposed Settlement. The Parties reached agreement through arm's length mediation before a retired Magistrate Judge. Counsel have a wealth of experience litigating class actions. As one court noted in similar circumstances: "[T]he fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable." In re Indep. Energy Holdings PLC, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003). Additionally, a court "should attribute significant weight to the belief of experienced counsel that settlement is in the best interests of the class." Austin v. Penn. Dep't of Corr., 876 F. Supp. 1437, 1472 (E.D. Pa. 1995).

The manner in which this Settlement was reached thus further shows that it is reasonable and fair.

For all these reasons, I will approve the Proposed Settlement.

### IV. PLAN OF ALLOCATION

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution

plan must be fair, reasonable and adequate." In re Ikon Office Solutions, Inc., Sec. Litig., 194

F.R.D. 166, 184 (E.D. Pa. 2000). "In general, a plan of allocation that reimburses class members

based on the type and extent of their injuries is reasonable." Id.

Here, the Plan of Allocation provides for recovery based on the strength of each Class

Member's claim. For example, whether a Class Member sold his or her Hemispherx shares

during the Class Period or held onto them will affect the damages allegedly suffered.

Accordingly, the Parties considered the sales date in their Plan of Allocation, as they did other

factors, such as whether the Class Member engaged in a short sale or whether the Hemispherx

shares were bought through the exercise of an option. *(See Doc. No. 62-4 at 16.)* Courts regularly

approve allocation plans that distribute funds according to the relative strengths and weakness of

class members' claims. See, e.g., Careccio v. BMW of N. Amer. LLC, No. 08-cv-2619, 2010

WL 1752347, at *2-3, 6 (D.N.J. Apr. 29, 2010) (individual class member recovery for

purchasing faulty tires was based, in part, on the miles traveled on the tires); In re Schering-

Plough Corp. Sec. Litig., No. 01-cv-0829, 2009 WL 5218066, at *5 (D.N.J. Dec. 31, 2009)

(approving plan of allocation that "compensate[d] for losses of class members based upon the

date the stock was purchased and whether the stock was sold during the class period or held

through the end of the class period"). Because the Plan of Allocation has a rational basis and was

developed by experienced Class Counsel in conjunction with a damages expert, I find that the

Plan of Allocation is reasonable. See id. at *5.

V.     **APPLICATION FOR ATTORNEYS' FEES AND EXPENSES**

Co-Lead Counsel request attorneys' fees comprising 29% of the Settlement Amount, or

$1,044,000, plus reimbursement of $25,858.90 in expenses, plus interest. *(Doc. No. 68.)* It is well

settled that attorneys litigating common fund matters are entitled to a fee from the fund as a

whole.  See Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). The Third Circuit has

repeatedly approved a "percentage-of-recovery method" for awarding fees in common-fund

securities fraud cases. See, e.g., In re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006) ("In

common fund cases such as this one, the percentage-of-recovery method is generally favored . . .

."). In considering a percentage-of-recovery amount, the "district court should consider the

Gunter factors, the Prudential factors, and any other factors that are useful and relevant with

respect to the particular facts of the case." Id. at 166. "The fee award reasonableness factors need

not be applied in a formulaic way because each case is different, and in certain cases, one factor

may outweigh the rest." Id. Under Gunter, district courts may consider:

> (1) the size of the fund created and the number of persons benefitted; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

Gunter, 223 F.3d at 195 n.1. Prudential adds:

> (1) the value of benefits accruing to class members attributable to the efforts of
> class counsel as opposed to the efforts of other groups, such as government
> agencies conducting investigations; (2) the percentage fee that would have been
> negotiated had the case been subject to a private contingent fee agreement at the
> time counsel was retained; and (3) any "innovative" terms of settlement.

AT&T, 455 F.3d at 165 (citing In re Prudential Ins. Co. of Amer., 148 F.3d 283, 338-40 (3d Cir.

1998)). The factors are guidelines for district courts to use in analyzing fee awards; the district

court need not analyze every factor. See AT&T, 455 F.3d at 166-75 (affirming district court

approval of fee award where district court only generally analyzed award under its Girsh

settlement approval analysis).

A. **The Size and Nature of the Common Fund Created and the Number of Persons Benefited by the Settlement**

The Settlement Fund totals $3,600,000 plus interest—a substantial and certain recovery, avoiding the expense, delay, and uncertainty of continued litigation. Forty-six thousand notice packets were mailed to identifiable Class Members. The number of persons recovering in this Settlement is likely to be in the thousands.

B. **Presence or Absence of Substantial Objections**

The 46,000 notice packets mailed to potential Class Members included Co-Lead Counsel's requested fee award of 29%. The miniscule number of objections here—only two—supports the reasonableness of the proposed award. See Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 148-49 (E.D. Pa. 2000) (requested fee award was reasonable where there was only one objector from over 5200 class members).

C. **The Skill and Efficiency of Co-Lead Counsel**

The Third Circuit has explained that the percentage-of-recovery method of awarding fees is intended to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198. Here, Co-Lead Counsel have decades of success litigating securities class actions. *(See generally Doc. No. 72-4, 72-5.)* The benefits Counsel have obtained for the Class attest to their experience and ability. See Cullen, 197 F.R.D. at 149 ("[T]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."). The competence of Co-Lead Counsel in this case weighs in favor of their requested fee award.

### D.  The Complexity and Duration of the Litigation, Risk of Non-Payment, and Amount of Time Devoted to the Case

Co-Lead Counsel have vigorously prosecuted their case for over eleven months, engaging in significant discovery and defeating Defendants' substantial Motion to Dismiss. Co-Lead Counsel undertook this litigation on contingency, assuming the risk that they would recover nothing. Finally, Counsel spent a substantial amount of time—almost 3,000 hours—litigating this matter. *(Doc. No. 68 at 15.)*

### E.  Awards in Similar Cases and in Non-Class Litigation

A 29% fee award is consistent with those granted in similar cases. See, e.g., In re Sterling Fin. Corp. Secs. Class Action, No. 07-2171, 2009 U.S. Dist. LEXIS 83224, at *15 (E.D. Pa. Sept. 10, 2009) (30% fee award); In re ATI Techs., Inc. Sec. Litig., No. 01-2541, 2003 U.S. Dist. LEXIS 7062, at *5 (E.D. Pa. Apr. 28, 2003) (30% fee award); In re Cell Pathways, Inc., Sec. Litig. II, No. 01-1189, U.S. Dist. LEXIS 18359, at *43 (E.D. Pa. Sept. 23, 2002).

Prudential asks courts to consider fee arrangements that were negotiated in private contingent fee agreements. 148 F.3d at 338-40. Fees of 30% or more are common. See, e.g., In re U.S. Bioscience Sec. Litig., 155 F.R.D. 116, 119 (E.D. Pa. 1994) (30% would likely have been the negotiated fee award in a private securities action); Ikon, 194 F.R.D. at 194 (plaintiffs' counsel in private contingency fee cases routinely negotiate 30-40% fee arrangements).

### F.  Lodestar Cross-Check

The Third Circuit advises district courts to test the percentage-of-recovery fee award proposal against the lodestar figure. See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005); see also Manual for Complex Litigation (Fourth) § 14.122 (2004) ("The lodestar is at least useful as a cross-check on the percentage method by estimating the number of hours spent

17

on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant."). Courts divide the percentage-of-recovery fee award by the lodestar figure to compute the so-called lodestar "multiplier." See, e.g., Ikon, 194 F.R.D. at 195.

The lodestar amount here, as credibly determined by Counsel, is $1,557,539.50, based on the 2,969 hours their firms spent on the case. *(Doc. No. 68 at 18-19.)* The proposed percentage-of-recovery fee total—$1,044,000—divided by the lodestar figure is .67, representing a negative multiplier. This compares favorably to settlements commonly approved where the lodestar multiplier is two or higher. See, e.g., Ikon, 194 F.R.D. at 195 (approving a fee award that is 2.7 times the lodestar).

### G.  Reimbursement of Expenses

Co-Lead Counsel requests reimbursement for expenses in the amount of $25,858.90. *(Doc. No. 68 at 21.)* According to Counsel's affidavit, the expenses include the cost of a damages expert, printing, Lexis and Westlaw research, modest travel costs, mediation fees, and postage. *(Doc. No. 74 at 31.)* I find these expenses to be reasonable. See Cullen, 197 F.R.D. at 151 (approving similar expenses in class action settlement).

For the foregoing reasons, I will approve Co-Lead Counsel's request for fee award and reimbursement of expenses.

**AND NOW**, this 11th day of February, 2011, it is **ORDERED** that:

1.  Lead Plaintiff's Motion for Final Certification of the Settlement Class *(Doc. No. 75)* is
    **GRANTED**;

2.  Lead Plaintiff's Motion for Approval for Final Approval of Class Action Settlement and
    Plan of Allocation of Settlement Proceeds and Award of Attorneys' Fees and
    Reimbursement of Expenses *(Doc. No. 69)* is **GRANTED**;

3.  Co-Lead Counsel shall receive interest on the Fee Award amount and the Reimbursement
    of Expenses amount from the date the Settlement Fund was created to the date of
    payment at the same rate that interest accrued on the Settlement Fund;

4.  The Settlement embodied in the Parties' Stipulation and Agreement of Settlement *(Doc.
    No. 62-1)* is approved in all respects, including the releases and barring of claims as set
    forth in that document, and the Parties are directed to effectuate settlement pursuant to
    that Stipulation;

5.  The Court reserves jurisdiction over all further proceedings arising out of this Action
    including proceedings concerning the administration, consummation, and enforcement of
    this Settlement;

6.   The Court finds that during the course of the Action, the Parties and their Counsel at all
     times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure;

7.   The Parties may agree to reasonable extensions of time to carry out any of the provisions
     of the Stipulation without further order of Court;

8.   All Settlement Class Members not listed on Exhibit 1 enumerating those persons who
     properly elected to exclude themselves according to the procedures set forth in the
     Preliminary Approval Order *(Doc. No. 65)* are bound by this Judgment;

9.   There is no just reason for delay in the entry of this Judgment and immediate entry by the
     Clerk of Court is directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure;

10.  This Action is **DISMISSED without costs and with prejudice**; and

11.  The Clerk shall mark this case **CLOSED** for statistical purposes.

                              **IT IS SO ORDERED.**

                              */s/ Paul S. Diamond*

                              _____
                              **Paul S. Diamond, J.**